UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

KRISTEN L. WOLF,

        Plaintiff,

        v.                          Case No. 05-C-0399

THE PRICE ERECTING COMPANY,

        Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DISMISSING CASE

        The plaintiff, Kristen L. Wolf, was an ironworker apprentice and member of Ironworkers Local Union No. 8 (Local 8). Local 8 ironworkers are regularly employed by the defendant, The Price Erecting Company (Price), under a collective bargaining agreement. Wolf alleges that she was harassed by two foremen while working at Price's Miller Brewing site. She filed this action pursuant to 42 U.S.C. § 2000 et seq. and 42 U.S.C. § 1981a claiming unlawful employment practices. Now before the court is Price's motion for summary judgment.

STANDARD OF REVIEW

        Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323.

Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## BACKGROUND

Price is a unionized company performing industrial installations, repair and reinforcement, erecting, and other activities. (*See generally* Kinney Aff. Ex. B. at 7.) It employs individuals in various building trade unions, including Local 8; all of the ironworkers at Price are members of Local 8. (DPFOF ¶¶ 11, 14.)[1] Price and Local 8 operate under a

---

[1] Defendant's Proposed Findings of Fact (DPFOF) and Plaintiff's Proposed Findings of Fact (PPFOF) are cited herein if the fact identified is asserted by both parties as undisputed, or the differences of the parties as to that fact is immaterial or not compliant with Civil Local Rule 56.2 (governing the submission and responses to proposed findings of fact on summary judgment).

standard collective bargaining agreement, governing work to be performed, wage rates, and conditions of employment. (DPFOF ¶¶ 15, 16, 30.) Along with Price, many regional employers are parties to that identical Local 8 collective bargaining agreement. (Kinney Aff. Ex. B. at 69-70.)

When the need arises, Price calls Local 8's hiring hall and requests a specific number of ironworkers needed at a job site. (DPFOF ¶ 17.) Generally, each site involves a ramp-up and ramp-down, during which more or less ironworkers will be needed on a given day. (DPFOF ¶ 28.) When an ironworker is not assigned to a site, that worker can either solicit work directly from a list of employers party to the Ironworker's collective bargaining agreement or go to the Local 8 hiring hall to register for available work. (DPFOF ¶ 30.) In addition, an ironworker is free to quit one employer and go work for another employer. (DPFOF ¶ 86.) Union members sent by the hiring hall to a Price site are employed by Price under the terms of the collective bargaining agreement. (Palmer Aff. Ex. A.)

There is a classification hierarchy among ironworkers: foremen, journeymen, and apprentice ironworkers. A foreman is a journeyman ironworker who is responsible for a work crew of about three or four and gives instructions to fellow ironworkers. (Palmer Aff. Ex. A. 18.) This may include allocating labor for various tasks, supervising the crew, and monitoring safety. (DPFOF ¶ 20.) In addition, if a site is large enough, a general foreman may be assigned to oversee four or more foremen. (PPFOF ¶ 137.) The authority of a foreman is set forth and limited by the collective bargaining agreement; however, a foreman cannot hire, fire, promote, or demote fellow bargaining unit members. (Waller Dep. 17; Paulson Dep. 17; Martino Dep. 81-82.) A journeyman may serve as a foreman one day, and as a journeyman the next at the same site. (DPFOF ¶ 23.)

An apprentice ironworker is a person in training and, generally, is assigned to a journeyman ironworker to ensure that work is performed safely and properly. (Wolf Dep. 36-37, 43-44.) An apprentice ironworker may move up to be a journeyman following completion of requirements set forth under Wisconsin law. (Wolf Dep. 36-37.)

Wolf was an ironworker apprentice commencing in 2000, and in August 2003, she started with Price as an apprentice on a powerhouse renovation project at Miller Brewing. (Wolf Dep. 50, 60.) When Wolf began her assignment with Price, she reviewed Price's Safety Program, including The Price Erecting Company Sexual Harassment Policy, and signed The Price Erecting Company Employee Safety Policy Statement Acknowledgment of Safety Training, affirming that she read and understood the Program and its contents. (Wolf Dep. 119-21; Kinney Aff Ex I; Reply Kinney Aff. Ex. O.) The Sexual Harassment Policy read as follows:[2]

---

[2] Wolf disputes the content of the Sexual Harassment Policy presented by the defendants in this case because it has not been demonstrated that this language is identical to the policy language Wolf read in the handbook when she started with Price in August 2003. Indeed, the Sexual Harassment Policy document in the record, identified as Kinney Affidavit Exhibit "I", is dated December 1, 2003—after Wolf quit her assignment at Price. However, Wolf was presented a copy of the quoted policy (Exhibit "I") at her deposition in this case:

> Q: Do you have [Price's Sexual Harassment Policy] in front of you. Can you tell me if you have seen this language before?
> A: No I haven't seen—I have seen it somewhere, but maybe.
> Q: Did you read and understand the Price Erecting Safety Manual?
> A: Oh, the little book, the handbook?
> . . . .
> A: Yeah, I read through the handbook. This is in the handbook.
> Q: You said "this is in the handbook?"
> A: I believe this is in the handbook. . . .
> Q: . . . But the policy itself you believe was in the, I guess you call it the little blue book?
> A. Yes.
> Q: . . . Is there anything in [the Price Sexual Harassment Policy exhibit] that jumps out at you that wasn't in the little blue handbook?
> A. No.

(Wolf Dep. 101-02.) Under the circumstances of this case, no issue of material fact exists regarding the language of the policy that Wolf initially reviewed because she admitted Price had a sexual harassment policy in place prior to her employment and there is no question that she understood how to issue a complaint.

4

C. Sexual Harassment

The Price Erecting Company will not tolerate any harassing behavior based on sex. Sexual harassment encompasses unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature. Sexual harassment occurs when: . . .

When such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile or offensive work environment,

Procedure:

A. Any allegation of sexual harassment or discrimination will be thoroughly investigated prior to any action being taken. The employee under investigation may be suspended pending the outcome of the investigation.

B. Any employee who feels that he or she is being subjected to sexual harassment or being denied equal opportunity by a supervisor, fellow employee or anyone else in the work environment, should immediately report such behavior to the supervisor or officer of the Price Erecting Company. . . .

D. Any employee who engages in any form of harassment or retaliates against another employee, who raises a discrimination or sexual harassment complaint, will be subject to discipline up to and including termination.

(Kinney Aff. I.) Generally, Price's safety policy could be obtained at a site, and foremen were instructed to have all new employees review the policy. However, Wolf was not given copies of these documents to take home.

Wolf, Ken Lagowski, Dale Stefonich, and Bruce Hentges were among the members of Local 8 assigned to Price's Miller Brewing site. (DPFOF ¶ 36.) At the time, Price was managed and run by three project managers: Tim Baird, Peter Waller, and Jack Martino. (Baird Dep. 9-11; Martino Dep. 9.) Peter Waller was project manager/field superintendent for the Miller Brewing job and was at that site for an hour or two nearly every day. (Waller Dep.

5

6-9.)  Baird was a Vice President of Price, responsible for manpower, overall safety, purchasing, and bidding.  (DPFOF ¶ 34.)

In early September, the Miller Brewing site was temporarily shut down by the Occupational Safety and Health Administration (OSHA) following an accident.  (PPFOF ¶ 122.)  Several days later, Baird called Wolf and others to inform them that the Miller Brewing project would resume and that they could report to that site following a meeting at Price's offices on September 15, 2003.  (PPFOF ¶¶ 128, 129.)

Wolf, with Baird and twelve other ironworkers attended the September 15 meeting in Price's office lunchroom,  (PPFOF ¶ 129, 130.)  At the meeting, Wolf noticed a stack of magazines in the corner of the lunchroom and that at least the top magazines included pictures of naked women.  (Wolf Dep. 146-47.)  Some of the workers were flipping through the magazines.  (*Id.*)

When work restarted at the Miller Brewing site, Martino took over the field superintendent's duties from Waller; thereafter, Waller visited the site only a couple times per week to review progress.  (Waller Dep. 12, 15.)  A safety consulting firm was also hired, and two female representatives from the firm were at the site to monitor safety.  (Wolf Dep. 62-63.)  In addition, Lagowski, who was employed by Price as a union ironworker for thirty-three years, took over as general foreman at the Miller Brewing site.  (DPFOF ¶ 40; PPFOF ¶ 136, 137.)

Wolf first met Lagowski after returning to the Miller Brewing site following the shut down.  (PPFOF  ¶ 138.)  During a break, Lagowski asked her "what are you doing here?"; she ignored him.  (PPFOF ¶ 138; DPFOF ¶ 55.)  He later asked Wolf if her fiancé Bruce, a fellow journeyman ironworker, had told her about what he likes to "show new

6

employees," referring to his penis. Wolf said that Bruce had told her. Lagowski then asked "So, do you want to see it?" to which Wolf said no. (DPFOF ¶ 56; PPFOF 139.)

At the site, Wolf was assigned by Lagowski to fire watch in the basement area. After a couple weeks on fire watch, she told Lagowski that she no longer wanted fire watch duty because she did not like standing around all day. (DPFOF ¶ 58.) Lagowski then reassigned Wolf to a crew with Stefonich. (PPFOF ¶ 145.) In addition, Lagowski asked whether Wolf could drive a forklift. (PPFOF ¶ 145.) She replied that she could since she had been driving forklifts for ten years. (*Id.*) Afterward, Lagowski stated "Well, just pretend like you're driving to the mall." (DPFOF ¶ 59.) When Wolf responded that the statement was sexist, Lagowski joked to Stefonich about having made a sexist remark. (PPFOF ¶ 145.)

Later, while on a lunch break in the ironworker's trailer at the site, Wolf came across a picture of a woman "with large breasts with rubber bands tied around the front parts." (Wolf Dep. 72.) She tossed the picture aside. (DPFOF ¶ 60.) On two or three other lunch breaks, Lagowski made comments like "women are only good for the patch of hair on their crotch." (Wolf Dep. 74.) Repeatedly, he asked coworkers if they "had gotten 'laid' the night before." (PPFOF ¶ 154.) Wolf responded it was none of his business. (*Id.*)

On two occasions, Wolf found advertisements for electrolysis on her lunch box. (DPFOF ¶ 65.) Relatedly, someone, Wolf believes was Lagowski, drew her face with a beard and an anatomically correct female body on a piece of cardboard, attached it to an iron beam, and placed it near where Wolf was working. (PPFOF ¶ 157.) On another occasion, Wolf asked Lagowski if she could take time off to go to a Women in Trades conference, which her union recommended she attend. (PPFOF ¶ 159.) Lagowski responded that women in trades

7

was "stupid" and joked with Stefonich that they do not have a Men in Trades Conference. (Wolf Dep. 112-13.)

On October 6, 2003, at the end of the work day, Wolf entered the construction trailer and saw a newspaper advertisement for electrolysis. Lagowski and Stefonich were there. Lagowski asked her "What did you bring me?" referring to the ad. Wolf responded that "I'm saving this for court" and put the ad in her lunch box. (DPFOF ¶ 70.) Stefonich then told her "If you do that, your head's going to be in over the railing and your ass is going to be over the bridge in the river." Wolf said "bring it on," and Stefonich retorted "and your [fiancé] Bruce is going to be right behind you. . . . I am not kidding." (DPFOF ¶ 71-71; PPFOF ¶ 162-63.) A few minutes after that exchange, the group left the trailer and got into a truck for a ride back to the parking lot. (DPFOF ¶ 73.) Wolf wrote "Quit Price" on her personal calendar that same day. (DPFOF ¶ 75.)

The next morning, Wolf dressed for work, started to drive to the Miller Brewing site, but instead went to Price's corporate office. (DPFOF ¶ 76.) At the corporate office, she went to Martino's office and asked to talk with him. Wolf informed Martino of the previous day's activities, and "some of the things that had been said" to her in the preceding two weeks. (DPFOF ¶ 78.) Reluctantly, she identified Lagowski as responsible for some of the offensive comments and pictures, and indicated that Stefonich made the threat to throw her off a bridge. (PPFOF ¶ 169.) Martino then asked Baird to join the meeting and both informed Baird of what had happened to Wolf. (DPFOF ¶ 81.) Baird questioned whether Price had a policy "about that" and Martino replied that it did. (PPFOF ¶ 172.) Wolf knew Baird was the safety person for Price and a high level person. (DPFOF ¶ 82.) Because Wolf was concerned for her reputation and safety, she asked Baird to keep her complaint confidential.

Baird responded that he would try to maintain her confidentiality, but noted that he also needed to investigate the matter.  (DPFOF ¶ 83.)

At the conclusion of the meeting, Baird and Martino asked Wolf what she wanted them to do.  (PPFOF ¶ 174.)  Baird proffered Wolf a couple alternatives: she could return to the Miller Brewing site, or Price could transfer her to another site at Briggs & Stratton.  (DPFOF ¶ 84.)  It was unlikely Lagowski or Stefonich would be placed at the Briggs & Stratton site because that job was small (only three or four ironworkers); however, Baird could not promise Wolf that she would not run into Lagowski or Stefonich at a future job site, including Briggs & Stratton.[3]  (DPFOF ¶ 88.)  Baird advised Wolf that she could take a few days off to think about things.  After the meeting, Wolf left the building with the understanding that she would call Baird once she decided what she wanted to do.  (Wolf Dep. 103-04.)

Wolf did not call Baird in the days following the meeting, so Baird called her.  (Baird Dep. 30.)  When they spoke, Wolf informed Baird that she was not going back to Price because she was not comfortable working for Price; rather, she was going to go to the union hall for another assignment.  (DPFOF ¶ 96-97; Baird Dep. 31.)  Later, she spoke with Baird and Martino about picking up her tools and arranged to do so at the Price offices, rather than

---

[3] The parties dispute what was said exactly, or more to the point, not said, at this meeting regarding the possibility that Wolf would ever be on the same Price site with Lagowski or Stefonich.  In her deposition testimony, Wolf claimed that Baird said he couldn't promise "when he moved me to the Briggs job, that the other guys wouldn't be down there right after I got there.  That's the only thing he could not promise."  (Wolf Dep. 101-02.)  Martino, on the other hand, testified that he did not believe such a statement was ever made because no one could make a promise that she would never run into either of those men in the future.  (Martino Dep. 59.)  He stated that they could try to keep Lagowski and Stefonich away from any site that Wolf was assigned to, but that they could not guarantee it wouldn't happen.  (*Id.*)  In addition, he stated that "we indicated that we were willing to come along and take her off of the Miller Brewing project.  If she wanted to continue working for the Price Erecting Company, we would make whatever arrangement is necessary to get her away from those two individuals she didn't feel comfortable with."  (*Id.*)  Baird stated he had no recollection of discussion whether Price could guarantee protecting Wolf from Lagowski or Stefonich.  (Baird Dep. 29.)  In any event, at this stage of the proceedings, the court attempts to put the pieces together from Wolf's version of the facts, to the extent supported by the record.

at the Miller Brewing site. (PPFOF ¶ 186; Baird Dep. 32-33.) When she picked up her tools on October 18, 2003, she informed Martino that she had taken an assignment with a different contractor. (DPFOF ¶ 99.)

While accepting the assignment with a different contractor, Wolf did not show up because she "wasn't ready to go." (Wolf Dep. 155-56.) On November 3, 2003, Wolf called Price and said that she was receiving medical treatment related to her experiences at the Miller Brewing site and that her doctor had not released her to return to work. (PPFOF ¶ 195.) Wolf's doctor noted that she had been unable to work due to an anxiety disorder, which he first recognized on October 17, 2003. (Dudor Dep. 55.) Wolf also advised Price that she was filing a claim for worker's compensation.

When Price was informed that Wolf was filing a worker's compensation claim on November 3, 2003, it undertook an investigation of her complaints related to the Miller Brewery site. (Baird Dep. 37.) Prior to that date, Price had not questioned any employees. (Baird Dep. 37.) Baird brought Lagowski, Stefonich, and another foreman at the Miller Brewing site, Mike Paulson, in for questioning but did not disclose that the questions related to Wolf, in an attempt to maintain confidentiality as Wolf initially requested. (Baird Dep. 37-38; DPFOF ¶ 102.) Between November 10 and 11, 2003, the three foremen were asked separately by Baird if they knew Price had a policy on sexual harassment; if they knew of any incidents that could be considered harassment; and if they observed any possibly harassing jokes, pictures, or other comments. None indicated that they had observed any instances of harassing behavior, and all but Stefonich indicated they knew of Price's sexual harassment policy. (DPFOF ¶¶ 102, 103; PPFOF ¶¶ 200-03.) Baird also interviewed the two female safety consultants, who had been on the Miller Brewing site since the OSHA shut down, to

determine if they had witnessed any harassing behavior. They replied that they had not. (DPFOF ¶ 105.) Following the interviews, Price distributed "weekly safety things regarding non-harassment." (Baird Dep. 40.)

Wolf filed a discrimination claim with the Equal Employment Opportunity Commission. After receiving her Right to Sue Notice from the EEOC, she commenced this suit alleging a hostile work environment based on sexual harassment, retaliation, constructive discharge, and damages.

## DISCUSSION

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), and discrimination against an employee in retaliation for opposing a practice otherwise made unlawful under Title VII, 42 U.S.C. § 2000e-3(a). Discrimination under Title VII includes sexual harassment in the workplace, *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006), and retaliation against an employee because the employee has complained of illegal discrimination, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

To establish a prima facie case of hostile work environment based on sexual harassment, a plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Kampmier*, 472 F.3d at 940. Here, Price challenges Wolf's discrimination claim on the third and fourth elements listed above.

11

Hence, the parties focus their arguments on (A) whether Wolf was subject to a hostile work environment and (B) if so, whether Price can be held liable.

### A. Hostile Work Environment

"In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII. *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2004) (*quoting Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336 (7th Cir. 2001)).  To do so, she must show that it "was both objectively and subjectively offensive."  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir.2004).  In this case, Price does not contest that Wolf believed her work environment was hostile, and thus meets the subjective prong of this element.  As to objective hostility, "[c]ourts look to several factors . . . including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance."  *Kampmier*, 472 F.3d at 941 (*citing Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir.2000)).

"[T]he line between actionable and nonactionable sexual harassment 'is not always easy' . . . "; it is not governed by a "mathematically precise test."  *Robinson*, 351 F.3d at 329.  "The 'occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers' generally does not create a work environment that a reasonable person would find intolerable."  *Id.* (*quoting Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)). However, when the offensive conduct is proved to be so severe, even isolated incidents may potentially create a hostile work environment for the employee.  *See Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002).

12

In *Robinson v. Sappington*, the Seventh Circuit found that a hostile work environment may exist based on the employer's repeated sexually suggestive comments toward the plaintiff over a period of months, physical touching of the plaintiff, and at least one threat against the plaintiff. 351 F.3d at 330-31 ("Viewing the evidence in the light most favorable to Ms. Robinson, we believe that a jury could conclude that Judge Sappington's conduct towards Ms. Robinson was objectively hostile. Sexually suggestive and intimidating incidents occurred on almost a weekly basis from the end of July until the middle of October. This was combined with daily evidence that Judge Sappington had a more-than-professional interest in Ms. Robinson and closely observed everything she did. As well, several actions and remarks of Judge Sappington were threatening, either overtly or in a more suggestive manner.").

In *Valentine v. City of Chicago*, the court found a question of fact on the issue of hostile work environment as the defendant "allegedly made comments or gestures directly to [the plaintiff] on a nearly daily basis and touched her on half a dozen occasions." 452 F.3d 670, 682 (7th Cir. 2006). In that case, the plaintiff alleged that the defendant "rubbed his crotch in front of her nearly every day; asked her on twenty occasions to leave her fiancé; asked her on dates between 30 and 40 times; made repeated comments about her 'tits' and 'ass'; and on six occasions rubbed [her] arm or shoulder." *Id.* at 681.

On the other hand, it has been held that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). For example, "complaints of no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts

13

to make eye contact, and four isolated incidents in which a co-worker briefly touched . . . [a woman's] arm, fingers, or buttocks" were insufficient to create a hostile work environment. *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998). Similarly, requests for dates, references to "dumb blonds," placing signs stating "I love you" at the plaintiff's workspace, and an attempt to kiss the plaintiff at a bar, fell short of creating a hostile workplace. *See Weiss v. Coca-Cola Bottling Co. of Chi.,* 990 F.2d 333, 337 (7th Cir. 1993); *see also Saxton v. Am.Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993).

In this case, Wolf asserts the following events combined to create a hostile work environment: (1) magazines with pictures of naked women were visible in the Price office lunchroom when Wolf attended a safety meeting prior to restarting of the Miller Brewing job; (2) Lagowski commented to Wolf on whether her fiancé told her what he likes to show new employees (referring to his penis) and if she wanted to see it, (DPFOF ¶ 56); (3) Lagowski's comment to Wolf that she should "just pretend like you are driving to the mall" when referring to driving a forklift, (Wolf Dep. 67-68)); (4) a picture of "a woman with large breasts with rubber bands tied around the front parts" was encountered by Wolf in the lunch area, (Wolf Dep. 72); (5) Lagowski commented two or three times that "women are only good for the patch of hair on their crotch," then looked at Wolf to see her reaction, (Wolf Dep. 74); (6) Lagowski asked coworkers if they "got laid the night before," (Wolf Dep. 74); (7) an electrolysis advertisement was found on Wolf's lunch box, (Wolf Dep. 76); (8) a cardboard drawing depicting Wolf's face with a beard, "boobs and the whole works," was on a beam hoisted to an area close to where Wolf was working (Wolf Dep. 76-78); and (9) Stefonich questioned in Wolf's presence "why women aren't at home doing cooking like before," (Wolf Dep. 80).

14

It is apparent that the comments of Lagowski and Stefonich were crude and childish. Further, the court does not question that such behavior was offensive to Wolf and made her life at work unpleasant. However, the comments relating to driving a forklift, what women are "good for," questions about whether everyone "got laid" the night before and "why women were not at home cooking," advertisements about electrolysis, crude drawings of Wolf with a beard, and one pornographic internet download left in the lunch area, appear to reflect the "vulgar banter, tinged with sexual innuendo of coarse or boorish" coworkers described as nonactionable in *Robinson*. In addition, Lagowski's question to Wolf about "what he likes to show new employees" also, while certainly offensive and childish, was not based on her gender (he allegedly presents the question to all new employees), and did not result in him exposing himself (she answered no). As opposed to the sexual assaults, sexual propositions, and related behavior discussed in *Sappington*, *Loughman*[4], *Hostetler*[5], and *Valentine*, the offensive comments, actions, and drawings of Lagowski and Stefonich appear more in accord with that in *Weiss, Saxton*, and *Adusumilli*.

If this was all Wolf encountered on the job, it would be difficult for her to establish a prima facie case that she endured an objectively hostile work environment.

---

[4] In *Loughman v. Malnati Org. Inc.*, the plaintiff was faced with constant and repeated sexual harassment by coworkers over the course of years, including at least three physical assaults by coworkers that involved coworkers pinning the plaintiff against a wall and putting their hands under her clothes. She had informed supervisors of these incidents, but the harassment continued. 395 F.3d 404, 408 (7th Cir. 2005) ("A reasonable jury looking at the severity of the incidents and Loughman's frequent complaints could find that Loughman believed her work environment was offensive.").

[5] In *Hostetler*, the court noted that a reasonable person in the plaintiff's position could find the following behavior created a hostile work environment: "[t]wo of the three acts at issue in this case involved unwelcome, forcible physical contact of a rather intimate nature. Having a co-worker insert his tongue into one's mouth without invitation and having one's brassiere nearly removed is not conduct that would be anticipated in the workplace, and certainly not in a family restaurant." *Hostetler*, 218 F.3d at 807-08.

However, Stefonich's threat to throw Wolf off a bridge if she complained about the harassing behavior may tip the scales. The exchange on October 6, 2003, with Stefonich and Lagowski in the trailer, during which Stefonich threatened Wolf, was recalled by Wolf at her deposition:

> And I had gotten into the job trailer, and there was another newspaper cut-out there. And I had taken it. And Kenny [Lagowski] had said "What did you bring for me"—something to that effect. And I said, "I'm saving this for court" and I said that offhand, just to stop this, you know. I didn't mean it, like I'm going to save it for court. I just wanted finally just to stop it. And I put it in my lunch box, and that's when Dale [Stefonich] said, "If you do that, your head's going to be in over the railing and your ass is going to be over the bridge in the river." And I had said something to the fact of, "Well bring it on"—something to that. I don't really know why I said that, but I said something to that effect. And then he said "And your [fiancé] Bruce is going to be right behind you. . . . And I looked right at him, and he said "I'm not kidding."

(Wolf Dep. 81-82.) Wolf took this threat seriously, feared for her safety; and, informed Price of the harassment the following morning.

In *Frazier v. Delco Electronic Corporation*, the Seventh Circuit observed that "[a] threat to kill cannot easily be explained away as merely 'rude or childish behavior'." 263 F.3d 663, 668 (7th Cir. 2001). It found that while "the threat to kill itself was not actionable," a reasonable jury could conclude that a threat to kill, combined with follow up hostile behavior, could be considered "sufficiently ominous to make the workplace intolerable even to a person of average steadfastness." *Id.*[6] However, as that court stated, the employer does not violate

---

[6] In *Frazier*, the coworker-harasser made the violent threat while yelling abusively at the plaintiff. As the court described:

> He screamed that she was a "slut," a "motherfucker," a "whore," and a "motherfucking whore." When she asked him whether he was talking to her, he replied, "Yes, you fucking whore, I'm talking to you, you motherfucker. I'm sick and tired of your motherfucking ass. You goddamn bitch, you slut, walking by me like I'm dirt." He threatened to take her outside and "kick her

the plaintiff's rights until it fails to take effective action to protect the plaintiff and end the harassment. *Id.*

Here, Stefonich's threat against Wolf understandably caused her great anxiety and emotional trauma. And it could help Wolf to establish that she suffered an objectively hostile work environment. However, even if it were assumed a question of material fact exists on this point, liability will stem only from a failure by Price to take effective action to remedy the situation once it was apprised of the harassment.

### B. Employer Liability

The fourth element of the prima facie case requires that a basis for employer liability exist, regardless of whether the workplace may be considered hostile. "The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker." *Rhodes,* 359 F.3d at 505.

> Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action. Conversely, an employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has been negligent either in discovering or remedying the harassment.

*Id.* at 505-06 (internal citations omitted); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("An employer is not strictly liable for sexual harassment of one worker by

---

motherfucking ass" and kill her. He acted as if he were going to hit her. A male coworker grabbed him and pushed him out of the area.

The plaintiff immediately notified her supervisors of this incident, and over the following weeks and months she complained to management about the harasser, who continuously glared at her at the workplace. During this time, management never disciplined the harasser and informed the plaintiff that it would do nothing to prevent him from contacting her at work. *Frazier*, 263 F.3d at 665 (7th Cir. 2001).

17

another unless, perhaps, the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him.").

Here, Wolf maintains that Lagowski and Stefonich may qualify as supervisors, making Price vicariously liable. "'Supervisor' is a legal term of art for Title VII purposes." *Rhodes*, 359 F.3d at 506. The strict liability of an employer under Title VII is called for when "a supervisor's conduct is made possible by the 'abuse of his supervisory authority,' his apparent authority, or because his supervisory position aided him in accomplishing the harassment." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (*quoting Faragher*, 524 U.S. at 803); *see also Robinson*, 351 F.3d at 327 ("[T]he employer may be subject to vicarious liability to an employee for a hostile work environment created by a supervisor with immediate authority over the employee. However, when no tangible employment action had been taken, a defending employer may raise an affirmative defense to liability or damages." (Internal citation omitted)). "An individual is not a supervisor unless he possesses the authority to *directly* affect the terms and conditions of a victim's employment." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). "[A]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes*, 359 F.3d at 506.

In *Hall*, the court held that a woman's alleged harasser was not a supervisor for Title VII purposes even though he "(1) possessed the authority to direct her work operations (i.e., which machines she ran); (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees." 276 F.3d at 355. The court concluded that these attributes did not meet the definition of a supervisor because there

was no evidence that the defendant had "the authority to 'hire, fire, demote, promote, transfer, or discipline'" the plaintiff. *Id.* In *Rhodes*, even though the alleged harassers "managed Rhodes' work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" to the employer, the court ruled that the defendants did not have authority to "affect the terms and conditions of employment" because they could not "hire, fire, promote, demote, discipline or transfer" this plaintiff. *Rhodes*, 359 F.3d at 506. The authority given to union foremen on a job site was assessed in *Parkins v. Civil Constructors of Illinois, Inc.* 163 F.3d at 1034. As a result, the court found that even through the two alleged harassers may have served as foreman or crew chiefs, they did not have enough authority to alter the conditions of the plaintiff's employment for Title VII purposes. *Id.* ("Neither Strong nor Boeke ever substituted for a superintendent. Although both frequently worked as foremen, they also served in positions in which they did not function as foremen. . . . Foremen or crew chiefs do not decide what work is to be done at a site and do not have the authority to decide how many employees will be assigned to their crews, although they can request more employees.").

On the other hand, in *Valentine v. City of Chicago,* a question of material fact existed as to whether a lot supervisor overseeing 40-50 truck drivers at a City Department of Transportation yard qualified as a supervisor under Title VII. 452 F.3d 670. The court determined that the City admitted the lot supervisor had the authority to transfer drivers to other DOT yards, and "the ability to transfer employees is the ability to affect the terms and conditions of employment." *Id.* at 679.

Here, Wolf points to the ironworkers' collective bargaining agreement to which Price was a party. Article XV of the agreement provides that "The General Foreman and

Foreman shall be agents of the Employer and shall be of the Union or shall have made application to become members." (Palmer Aff. Ex A. at 18.) She further argues that foremen have "the power to assign jobs and discipline workers with verbal or written warnings. . . . They can and do send workers away from the site if they have good reason to." (Pl.'s Mem. in Opp. at 16.)

While the agreement may refer to foremen as "agents," the Seventh Circuit has "consistently distinguished employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." *Parkins*, 163 F.3d at 1033 (finding that under the circumstances the union foremen are not supervisors for Title VII purposes). There is no debate that Lagowski or Stefonich, when serving as foremen or general foremen, lacked the authority to hire, fire, promote, or demote other ironworkers. The lack of legal agency between the foreman and employer is further enhanced by the agreement's provision permitting an employer, but not a foreman, to "employ and discharge whomever they see fit, provided . . . there shall be just cause for the discharge." (Palmer Aff. Ex. A. at 29.)

It is true that foremen may have the authority to "send workers away"; however, this authority appears strictly limited and even the testimony cited to by Wolf in support of this point is conflicting.[7] The evidence in the record supports a finding that a foreman may be able

---

[7] While not specifying where in the record she finds such authority, it appears from her responses to Defendants Proposed Findings of Fact that she relies on Martino's testimony. In his deposition, Martino explained that foremen may have the authority to send a worker from a site if that worker was misbehaving or if there were too many workers assigned to one site. (Pl.'s Responses to DPFOF ¶ 19.) She also points to Martino's answers, over objections, to hypothetical situations in which a foreman may be called on to address personnel problems. (*Id.*; Martino Dep. 15-16.) In no place is it challenged that formal disciplinary measures are to be handled by the Price field superintendent. Further, in no place is it asserted that, like in *Valentine*, a foreman had the authority to transfer ironworkers to and among the various Price work sites.

to send a worker from the site only if he concludes that the worker was impaired or misbehaving. However, under those circumstances, the field supervisor would be called in to render the ultimate decision, (Martino Dep. 13-14, 16), a fact conceded by Wolf (Pl.'s Mem. in Opp. at 16 ("They [foremen] can and do call the superintendent manager and tell them they want a particular worker off the job.")). Personnel matters were referred to Price's field superintendents, to whom the foremen and general foreman report. In addition, there is no argument that Lagowski or Stefonich's comments or actions took the form of an abuse of authority, as discussed in *Baskerville*, 50 F.3d at 431, and *Parkins*, 163 F.3d at 1034. Hence, the minimal authority possessed by foremen in this case is similar to that possessed by the alleged supervisors in *Hall, Rhodes, and Parkins* as opposed to *Valentine*. Thus, no issue of material fact exists on this aspect of the plaintiff's claim.[8]

With this in mind, Price will be liable to Wolf only if "it k[new] or should [have known] that wrongdoing [was] afoot and yet fail[ed] to take steps reasonably designed to stop it." *Hostetler*, 218 F.3d 811; *see also Loughman*, 395 F.3d at 407 (noting that an employer is liable for coworker harassment only if the employer negligently failed to take reasonable

---

[8] Alternatively, Wolf argues that even if Lagowski and Stefonich were not supervisors under Title VII, Price nonetheless owed a "heightened duty of care." For support, she points to *Doe v. Oberweis Dairy*, 456 F.3d 704, 717 (7th Cir. 2006). In that case, the plaintiff, a minor teenage female employed as a "scooper" in an ice cream parlor, brought suit against the employer alleging sexual harassment—behavior that ultimately led to statutory rape---by the shift supervisor, Mr. Nayman. The court noted that Nayman's position as shift supervisor did not fit nicely into either the supervisor or coworker categories anticipated by Title VII case law. While Nayman could not hire or fire other employees, he had authority to direct the work of the scoopers. *Id*. Further, he was "often the only supervisor in the ice cream parlor and . . . the workers he was supervising were for the most part inexperienced teenagers working part time." Under these circumstances, the court found that Nayman's position gives way to a heightened risk of sexual harassment than had Nayman been merely a scooper, and that as such the employer should have taken greater care to protect the teenage scoopers. *Id*. at 717-18. However, while no doubt Wolf was in a profession dominated by men and may have been the only female ironworker at a particular site, the circumstances of *Oberweis Dairy*—which involved a possible sexual predator with authority, though minimal, over young teenagers, a small work environment, and no procedures in place "for protecting girls like the plaintiff from what happened to her"—is distinguishable from this case.

21

steps to discover or remedy the harassment); *Erickson v. Wis. Dept. of Corrections*, 469 F.3d 600, 606 (7th Cir. 2006) ("In other words, an employer who receives notice that some probability of sexual harassment exists must adequately respond to that information within a reasonable amount of time.").  In general, an employer will not be considered apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes*, 359 F.3d at 506-07.  What constitutes a reasonable response by the employer once apprised of the harassment "depends on the gravity of the harassment." *Baskerville*, 50 F.3d at 432 (noting for example that had the alleged harasser physically "assaulted Baskerville, due care might have required the company to fire him on the spot").

At the outset, Wolf questions whether Price even had a sexual harassment policy in place when she was harassed by Lagowski and Stefonich.  If Price did not have a sexual harassment policy in place that could support an argument that Price was negligent in its efforts to discover sexual harassment.[9]

_____

[9] Wolf asserts that even if it is established that the harassers are not supervisors, the employer still bears the burden of producing "the [sexual harassment] policy as it existed when it was purportedly applicable to the Plaintiff." (*See* Pl.'s Mem. in Opp. at 18.)  Unfortunately, she provides no authority for this assertion and instead references *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), which involved *supervisor* harassment and circumstances in which no sexual harassment policy was disseminated to supervisors and employees at the plaintiff's workstation.  524 U.S. 775, 781, 808 (1998).

Once it is established that the harassers are not supervisors, the defendant is not required to present a *Ellerth/Faragher* defense in order to avoid liability.  In this situation, the burden is on the plaintiff to demonstrate an employer's failure "to take reasonable steps to discover or remedy the harassment." *Loughman*, 395 F.3d at 407.  As such, Wolf's comparisons with *Faragher*, 524 U.S. 775,  and *Gentry*, 238 F.3d 842, are weakened.  (*See* Pl.'s Mem. in Opp. 18, 20.)  However, while not necessarily outcome determinative in this setting, evidence that the employer had no sexual harassment policy or that its policy was unworkable under the circumstances may be considered when assessing whether the employer took reasonable steps to prevent or discover harassment.  *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 n.2 (7th Cir. 1999) ("In *Parkins*, we held that the harassers were not supervisors.  Accordingly, we applied the standard for co-worker harassment, as opposed to the supervisory liability standard.  However, the reasonableness of the employer's actions in preventing and responding to sexual harassment is relevant under both standards, the difference being who bears the burden of proof." (*citing Wilson v. Tulsa Junior College*, 164 F.3d 534, 541 (10th Cir.1998)).

However, Wolf's argument is outweighed by evidence that she admitted prior receipt and review of a version of Price's Sexual Harassment Policy in the Price Safety Program. (DPFOF ¶ 45.) While Price should have made the sexual harassment policy more accessible to workers at any site as a precautionary measure, that is not material in this lawsuit inasmuch as Wolf does not argue that she did not know who to contact regarding harassment or that the avenues of complaint were closed or hidden from her.[10] Similarly, Wolf's assertions that Baird, Waller, Lagowski, and Stefonich did not know exactly the procedures Price had for dealing with alleged sexual harassment are not sufficient to avoid summary judgment as they do not shed light on any failure by Price to discover the comments, pictures, or threats by Stefonich that were presented to Martino and Baird.

Wolf maintains that Price's response after hearing her complaints was inadequate. According to Wolf,

> an adequate response would have been to put Ms. Wolf on paid administrative leave, assure her of an immediate and thorough investigation, assure her that Mr. Lagowski, Mr. Stefonich, and the other workers would be given absolutely clear and unequivocal direction that they were not to contact her in any way and that any violation of that direction would result in immediate termination . . . and then actually undertake a thorough and full investigation.

(Pl.'s Mem. in Opp. at 22.) In addition, Wolf asserts that Price was unresponsive because it did not investigate her complaints until it was informed that she was applying for workers compensation, and that the option of transferring her to its Briggs & Stratton work site was not

---

[10] This point also goes to Wolf's argument that Price is liable because its Sexual Harassment Policy provided that complaints should be made to "the supervisor or officer of the Price Erecting Company" but did not identify who is an officer. The fact remains that once Wolf decided to complain about harassment, she sought out a Price supervisor (Martino), who then called Price's senior officer, Baird, into the meeting.

23

sufficient because protection from future encounters with Lagowski and Stefonich could not be promised.

Failure to take immediate action in response to a complaint creates liability when that failure results in some type of injury. *See Hostetler*, 218 F.3d at 809-10. In this case, other than a brief discussion with fellow ironworker Hentges prior to the OSHA shut down of the Miller Brewery Site, the meeting with Martino and Baird was the first time Wolf complained about harassment while employed at Price. (DPFOF ¶ 92.) And at this stage, the court takes it as true that Price did not immediately conduct an investigation into Wolf's complaint following her meeting with Martino and Baird and only questioned Stefonich and Lagowski about claimed harassing behavior after Wolf applied for workers compensation. However, contrary to Wolf's assertions, she cannot create a material issue of fact as to whether Price's response to her allegations was effective in preventing "further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). During their meeting on October 7, 2003, Baird asked Wolf what she wanted Price to do in response to the claimed harassment. Moreover, Baird proffered alternatives—continued work at the Miller Brewery site, transfer to Briggs & Stratton and taking a few days off to think about the options. (Wolf Dep. 103.) All parties were under the impression that Wolf would call Baird after she decided what to do. However, in the few days after the meeting, Wolf made the decision to quit Price, (Wolf Dep. 105-06); but, she did not inform Baird of the decision until after Baird followed up with her.

An employer cannot "be expected to rectify a situation within minutes of its occurrence," *Frazier*, 263 F.3d at 666, and Price's actions constitute a prompt and reasonable response to her complaint under the circumstances. Additionally, Wolf's decision to quit Price

24

and reject its transfer offer limits Price's liability. Following her complaint to Price, Wolf was not subject to, or in a position to be subject to, additional harassment by Lagowski or Stefonich. Also, Baird's transfer offer was immediate, valid, and intended to distance Wolf from her harassers. Further, Baird noted that he intended to investigate Wolf's complaints. That Price refused to promise Wolf that she would not encounter Lagowski or Stefonich at a future job site does not render the offer unreasonable on its face. An employer is not required to fulfil every expectation of the employee, so long as its response is prompt and calculated to prevent future harassment, *see Saxton*, 10 F.3d at 535 ("Although AT&T's remedial efforts did not meet Saxton's expectations, they were both timely and reasonably likely to prevent the conduct underlying her complaint from recurring."), and Wolf presents no evidence, other than speculation, that she would be subject to future harassment under the transfer option, *see Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3rd Cir. 1997).[11]

Further, Price's failure to undertake an immediate investigation does not create liability because Wolf can demonstrate no injury based on delay. *See Hostetler,* 218 F.3d at

---

[11] Along these lines, the court also rejects Wolf's assertion that the transfer to the Briggs & Stratton site would effectively leave her "worse off" because Price could not promise she would never run into Lagowski or Stefonich. Any analogy to *Hostetler* on this point is therefore unhelpful as the transfer of the plaintiff in *Hostetler* could be considered less desirable because "the new assignment brought with it a lengthy commute and a marathon work schedule . . . [which] objectively could be viewed as a burdensome . . . . 218 F.3d at 811. Here, not only was Price not required to make the promise that Wolf apparently expected, she never in fact accepted the transfer offer given.

The court further rejects Wolf's attempt to analogize this case to *Erickson v. Wisconsin Department of Corrections*, 469 F.3d 600, in which the Seventh Circuit found material issues of fact exist regarding the employer's liability in a hostile work environment claim. In *Erickson*, the plaintiff notified her supervisors that one of the inmate janitors, who was conditionally permitted to work during certain hours in the office space that the plaintiff worked, was present in the office while plaintiff was working alone. Her supervisors apologized to her and informed her that it would never happen again. Eight days later, the inmate appeared again, raped her, and escaped with her car. The employer argued that it could not be held liable because it was never notified of prior acts of sexual harassment, which the court rejected. Under the circumstances, the court found that the plaintiff sufficiently notified her employer of a risk upon which they should have acted. 469 F.3d at 607. Contrarily, in this case, there was no similar failure by Price to follow through on its response as Wolf never returned to a Price work site after issuing her initial complaint.

810 ("An employer is no doubt obligated to act with dispatch when it is informed that an employee is effectively assaulting his coworkers. But in this case there is no evidence that Hostetler was in any way injured by Quality's failure to act more quickly. . . . Under these circumstances, there would be no point in us determining whether the circumstances obligated Quality to act more quickly than Hostetler asserts that it did." (Internal citations omitted)); *Knabe*, 114 F.3d at 412 ("Even if a company's investigation into complaints of sexual harassment is lacking, the employer cannot be held liable for the hostile work environment created by an employee under a negligence theory of liability unless the remedial action taken subsequent to the investigation is also lacking."). Once Wolf made her decision not to return, Price's subsequent actions cannot generate liability on this claim. Consequently, Wolf has failed to establish a prima facie case of Title VII hostile environment sexual harassment.

## C. Constructive Discharge

In her complaint, Wolf alleges that Price unlawfully retaliated against her when foremen at the site "threatened her with physical harm and death if she complained about the hostile work environment." (Compl. 1.) Further, she asserts that she "was constructively discharged from her employment when Price failed and refused to remedy the unlawful sexual harassment and retaliatory threats." (Compl. 1). However, Wolf presents no support for her retaliation/constructive discharge claim (more important, she presents no opposition to Price's attack on this claim) in her Memorandum in Opposition to Defendant's Motion for Summary Judgment.

To support a retaliation claim under Title VII, the plaintiff must have suffered an adverse employment action, which can include constructive discharge. *Williams v. Waste*

*Mgmt. of Ill.*, 361 F.3d 1021, 1031-32 (7th Cir. 2004). "To establish a claim for constructive discharge under Title VII, a plaintiff must prove that [her] working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Further, the "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because 'in the ordinary case, an employee is expected to remain employed while seeking redress.'" *Id. (citing Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir.1998)). In other words, a finding of sexual harassment and hostile work environment does not necessarily require a finding of constructive discharge. *See Pa. State Police v. Suders*, 541 U.S. 129, 146 (2004).

"[T]he primary rationale behind the heightened standard in constructive discharge cases is to permit an employer to address a situation before it causes an employee to quit." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). Hence, "[a]n employer constructively discharges an employee only if it *makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Saxton*, 10 F.3d at 536-37 (*citing Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 426 (7th Cir.1989)).

A "credible death threat that signals grave danger to the plaintiff's bodily integrity . . . can constitute grounds for finding constructive discharge." *Tutman*, 209 F.3d at 1050. For example in *Brooms v. Regal Tube Co.*, the court found that "repeated instances of grossly offensive conduct and commentary, which culminated with the incident in which [the harasser] showed an extremely offensive photograph to [the plaintiff], grabbed her arm when she attempted to seize a copy, and threatened to kill her, created a situation which would cause a reasonable employee in [the plaintiff's] position to contemplate immediate departure." 881

27

F.2d 412 (7th Cir. 1989) *overruled on other grounds as recognized in Saxton*, 10 F.3d at 533. However, the liability of the employer rested on its knowledge of the harassing behavior and failure to take reasonable remedial measures. *Id.* at 421.

That Wolf was offered the option of transferring undermines a claim that "quitting was the only way she could extricate herself from the intolerable conditions." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997). Regardless, because Wolf's constructive discharge claim is based on the same events that fail to sustain her hostile work environment claim, she cannot avoid summary judgment on the constructive discharge claim. *See Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) ("Because we have decided that Bannon has not made the necessary showing to support her hostile work environment claim, it follows that her constructive discharge claim fails."); *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 463 (7th Cir.2007).

Therefore,

IT IS ORDERED that the defendant's motion for summary judgment is granted and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 29th day of April, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE